UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: SEP 0 2 2015

Roshni D. Thackurdeen, et al.,

              Plaintiffs,

    —v—

Duke Univ., et al.,

              Defendants.

14-cv-6311 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

This case arises from the tragic drowning death of Ravi Thackurdeen ("Ravi" or "Thackurdeen"), a student at Duke University ("Duke") and the Organization for Tropical Studies ("OTS," and, collectively with Duke, the "Defendants" ), a North Carolina-based institution promoting research and education about the use of natural resources in the tropics. Thackurdeen's parents, Roshni D. Thackurdeen and Raj B. Thackurdeen ("Plaintiffs"), bring suit individually and on behalf of the decedent against Defendants Duke and OTS for various negligence-based claims and for a claim of intentional infliction of emotional distress. *See* Dkt. No. 1.

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C § 1332. Defendants, however, now move to dismiss the case for lack of personal jurisdiction. *See* Dkt. Nos. 16, 27. For the reasons below, Defendants' motions are GRANTED.

1

## I.  BACKGROUND

### A.  Jurisdictional Facts[1]

On January 23, 2015, the Court granted Plaintiffs the opportunity to engage in limited jurisdictional discovery. *See* Dkt. No. 36. That period of discovery closed on February 28, 2015. *Id.* Based on that discovery, the parties have provided the Court with the following facts relevant to the subject of personal jurisdiction.[2]

#### 1.  Duke

Defendant Duke is a non-profit research and educational institution organized under the laws of North Carolina. *See* Dkt. No. 18 ("Thornton Declaration") ¶ 2. It maintains its offices and principal place of business in Durham County, North Carolina. *Id.* Duke recruits students from across the whole of the United States, including New York. *Id.* ¶ 5. Each year, approximately eight percent of Duke students come from New York, although North Carolina is consistently the state with the greatest number of undergraduate, graduate, and professional school students at the university. *Id.* Duke employs two recruitment officers specifically tasked with recruiting students from New York. *See* Guttentag Dep. 8:11-18.

Duke has a substantial economic impact within North Carolina, operating a number of business entities and maintaining an extensive network of facilities within the state. *See* Thornton Decl. ¶¶ 3, 6, 7. Duke also operates an extensive motor fleet comprising hundreds of

---

[1] The parties do not dispute the following facts, but rather only their legal significance in terms of the Court's exercise of personal jurisdiction over Defendants Duke and OTS.

[2] In their opposition to the Defendants' motions to dismiss, Plaintiffs contend that Duke and OTS should be treated as a single entity due to overlapping employees and administration. *See* Opp. 7. Plaintiffs put forward no legal support for their argument and the Court is not in a position to determine whether Duke and OTS are, in fact, legal alter egos such that they may be referenced interchangeably. Similarly, the Court is unable to determine at this juncture if OTS acted as Duke's agent during the time period at issue in the complaint. The Court notes that Plaintiffs referred to both Defendants as distinct entities in their pleadings. *See* Compl. ¶¶ 2-3. Moreover, each Defendant is represented by separate counsel and has put forward separate motions to dismiss premised on similar, but not identical, legal theories. Accordingly, the Court's Memorandum & Order treats Duke and OTS as separate entities.

2

vehicles. *Id.* ¶ 8. All of these vehicles are licensed and based in North Carolina with the exception of a single vehicle licensed in Montana. *Id.*

Duke has no offices, stores, or campus in New York, nor does it own any real property in the state. *Id.* ¶¶ 9-10. It is not registered to do business or offer online distance education in New York. *Id.* ¶¶ 13-14.

The university does, however, offer three education programs in New York in conjunction with New York University. *Id.* ¶ 19. It also offers volunteer programs in a number of locations around the world, including New York. *Id.* ¶ 20. Duke also sends athletic teams to compete within New York and maintains an active alumni association within New York. *Id.* ¶¶ 21-22. Indeed, Duke raises a substantial amount of money from alumni located in New York and employs a regional alumni director tasked specifically with fundraising money in New York. *See* Wilder Dep. 11:8-15. In the past five years, Duke has raised over $172,000,000 from alumni and organizations located in New York. *See* Dkt. No. 3 ("Meislas Declaration"), Ex. 3 ¶¶ 25-26.

### 2. OTS

OTS is a non-profit corporation that, like Duke, is incorporated under the laws of North Carolina and maintains its principal office in Durham, North Carolina. *See* Dkt. No. 28 ("Losos Declaration") ¶ 2. The office in Durham is OTS' only office in North America. *Id.* OTS facilitates and oversees international scientific research projects in Costa Rica and South Africa. *Id.* ¶ 3. OTS employs 228 people, most of whom work outside the United States. *Id.* ¶ 5. Those employees who are based in the United States work exclusively in Durham, North Carolina. *Id.*

OTS is sustained by fifty-five member institutions around the world, two of which are located in New York – Cornell University and SUNY-Stony Brook. *Id.* ¶ 6. These member institutions are allowed to vote on certain issues affecting the governance of OTS and pay annual

3

dues for membership. *Id.* Member institutions have no rights or interests, however, in any assets owned by OTS. *Id.* ¶ 8.

OTS does not own or rent any property in New York, does not have any employees in New York, does not pay taxes in New York, maintains no bank accounts within New York, nor is it registered to do business in New York. *Id.* ¶¶ 11-12. Approximately three percent of OTS graduate and undergraduate students for the 2014 fiscal year were affiliated with New York-based institutions. *Id.* ¶ 13. OTS actively recruits students from across the country, including within New York. *See* Hawkins Dep. 32:17–33:9. The contract Thackurdeen and his parents signed with OTS was executed within New York. *See* Roshni Thackurdeen Decl., Ex. 5.

### B.   The Death of Ravi Thackurdeen

Ravi Thackurdeen was, by all accounts, an exceptional individual. He graduated as the valedictorian of his high school, where he volunteered and participated in a myriad of activities. *See* Compl. ¶ 8. After graduating from high school, Thackurdeen enrolled at Swarthmore College where he volunteered with the Swarthmore Fire and Protective Association and earned EMT certification. *Id.* ¶ 9. While at Swarthmore, Thackurdeen developed an interest in medicine, serving as an extern at Weill Cornell Medical College, conducting research into antibiotics, and serving as a member of the Swarthmore Pre-Med Society. *Id.*

In the spring of 2012, Thackurdeen temporarily enrolled as a student at Duke in order to participate in a Global Health and Tropical Medicine program run by OTS in Costa Rica. *Id.* ¶ 10. Enrollment with Duke was a requirement for the OTS program. *Id.* ¶ 24. While studying with OTS in Costa Rica, Thackurdeen conducted research into the relationship between cooking practices and upper respiratory infections in the local Ngobe community in Costa Rica. *Id.* ¶ 10.

4

At the end of the semester, in late April 2012, the OTS students were taken on a surprise, celebratory trip to the beach at Playa Tortuga on the south central Pacific coast of Costa Rica. *Id.* ¶ 14. According to the complaint, the students were told that it was safe to swim off the beach and were given minimal instruction on how to react if caught in a rip current. *Id.* ¶ 15. While visiting the beach, Thackurdeen and a fellow student were wading in shallow water when they were caught by a rip current that pulled them further out to sea. *Id.* ¶ 16. Although a fellow beachgoer was able to swim out and rescue his classmate, Thackurdeen was pulled over 300 yards away from shore and was forced to tread water while waiting for help to arrive. *Id.* Help did not arrive in time and Thackurdeen drowned to death. *Id.* ¶ 17. His body was not ultimately recovered until over thirty-six hours after he drowned. *Id.*

Plaintiffs allege that, after Thackurdeen had drowned, Duke and OTS delayed notifying his parents about the incident. Several hours after Ravi had drowned, Margaret Riley ("Riley"), the Assistant Vice Provost for Duke's Undergraduate Global Education program, called the Thackurdeens and informed them that their son was missing. *Id.* ¶ 18. After receiving this news, Roshni and Raj Thackurdeen booked the first flight available to Costa Rica. *Id.* While at the airport in New York, Plaintiffs called Riley in order to obtain more information. *Id.* ¶ 19. Riley assured the Thackurdeens that "everything was fine." *Id.*

After arriving in Costa Rica on April 30, 2012, the parents and other members of Thackurdeen's family joined the Red Cross and Costa Rican Coast Guard in searching for Thackurdeen's body. *Id.* ¶ 20. According to the Thackurdeens, while these search efforts were underway, OTS continued to hold celebratory events for its students. *Id.* ¶ 21. The search efforts ultimately proved unsuccessful and Thackurdeen's body was not located until discovered by a local fisherman early on the morning of May 1, 2012. *Id.* ¶ 22

## II.   LEGAL STANDARD

Defendants each move to dismiss the complaint for lack of personal jurisdiction. "[I]n analyzing a Fed. R. Civ. P. 12(b)(2) motion, courts in New York follow a two-step process. First, a court will determine whether personal jurisdiction lies pursuant to New York's long-arm statute . . . Second, a court must analyze whether personal jurisdiction comports with the basic requirements of due process." *A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines*, 828 F. Supp. 2d 557, 563 (E.D.N.Y. 2011). There are two ways that New York exercises personal jurisdiction over non-residents: "general jurisdiction pursuant to N.Y. CPLR § 301 . . . or specific jurisdiction pursuant to N.Y. CPRL § 302." *Id.*

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 83 F.3d 560, 566 (2d Cir. 1996) (citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994). At this stage, the Court must construe the pleadings and any supporting materials in the light most favorable to the plaintiffs, resolving any doubts in favor of jurisdiction. *See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013). The Court does not, however, draw "argumentative inferences" in plaintiff's favor nor does it accept as true a legal conclusion couched as a factual allegation. *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) (citing *Norton v. Larney*, 266 U.S. 511, 515 (1925)). "Because a motion to dismiss for lack of personal jurisdiction is inherently a matter requiring the resolution of factual issues outside of the pleadings, all pertinent documentation submitted by the parties may be considered in deciding the motion." *Woods v. Pettine*, 13-cv-290 (PGG), 2014 WL 292363, at *1 (S.D.N.Y. Jan. 27, 2014) (internal quotations removed).

6

## III.   DISCUSSION

There are "two categories of personal jurisdiction: general and specific personal jurisdiction. General, all-purpose jurisdiction permits a court to hear 'any and all claims' against an entity. Specific jurisdiction, on the other hand, permits adjudicatory authority only over issues that aris[e] out of or relat[e] to the [entity's] contacts with the forum." *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 134 (2d Cir. 2014) (internal citations and quotations omitted). Plaintiffs have failed to demonstrate that this Court possesses either form of personal jurisdiction over Duke or OTS.

### A.   General Jurisdiction

In New York, general jurisdiction is governed by N.Y. CPLR § 301. Section 301 preserves the common law notion that "a court may exercise general jurisdiction over a non-domiciliary defendant if the defendant is engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction." *Chatwal Hotels & Resorts LLC v. Dollywood Co.*, 14-cv-8679 (CM), 2015 WL 539460, at *3 (S.D.N.Y. Feb. 6, 2015) (citing *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.,* 918 F.2d 1039, 1043 (2d Cir. 1990)). The Supreme Court has further clarified that the appropriate inquiry in determining whether a foreign corporation is subject to general jurisdiction in a state is whether that corporation's in-forum contacts "are so continuous and systematic as to render [the corporation] essentially at home in the forum State." *Daimler AG v. Bauman*, 134 S. Ct. 746, 761 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)) (internal quotations removed). Only in an "exceptional case" will "a corporation's operations in a forum other than its formal place of incorporation or principal place of business . . . be so substantial and of such a nature as to render the corporation at home in the state." *Id.* at 761

7

n.19. Neither Duke nor OTS is incorporated or has its principal place of operation in New York and Plaintiffs have failed to explain why this represents an exceptional case to the general rule.

Indeed, this case presents a very straightforward application of general jurisdiction precedent. A large number of federal courts, including ones within this district, have had the opportunity to consider whether a university or college may be deemed "at home" outside of its state of incorporation or principal place of operation. Most recently in this district, Judge McMahon rejected a plaintiff's claim that this Court had general jurisdiction over the University of Oklahoma, which, like Defendant Duke, "maintain[ed] no bank accounts in New York; own[ed] no real estate in New York; ha[d] no offices in New York; ha[d] no employees in New York; ha[d] no telephone or other similar contact in New York; and d[id] not routinely conduct or solicit business in New York." *Meyer v. Bd. of Regents of Univ. of Oklahoma*, 13-cv-3128 (CM), 2014 WL 2039654, at *3 (S.D.N.Y. May 14, 2014). The court was not swayed by the plaintiff's argument that the university "recruit[ed] students from New York and solicit[ed] and receiv[ed] contributions nationwide, including from New York residents" or that "it also ha[d] an exchange program that allow[ed] its students to spend a semester at New York University." *Id.* As here, such contacts were "insufficient to subject a nationally prominent university to general jurisdiction in this state." *Id.*

The general rule in these sorts of cases is well stated by a recent case from the Eastern District of Pennsylvania. In that case, Judge Tucker explained that

> Like all national universities, Dartmouth College maintains some contacts with the state including securities held by a bank headquartered in Pennsylvania, the recruiting of athletes and faculty living in the state, access to its website from within the state, and the admission and enrollment of students coming from the state. These *de minimis* contacts, which any national university may have with the state of Pennsylvania, are inadequate to establish general personal jurisdiction in this district.

8

*Isaacs v. Trustees of Dartmouth Coll.*, 13-cv-5708, 2014 WL 4186536, at *12 (E.D. Pa. Aug. 25, 2014) *aff'd sub nom. Isaacs v. Arizona Bd. of Regents*, 14-cv-3985, 2015 WL 1534362 (3d Cir. Apr. 7, 2015).[3] In other words, a university or college cannot be deemed "at home" in a forum merely because it engages in the sort of minimal and sporadic contact with the state that is common to all national universities. *See Gehling v. St. George's Sch. of Med., Ltd.*, 773 F.2d 539, 542 (3d Cir. 1985) ("Advanced educational institutions typically draw their student body from numerous states, and appellants' theory would subject them to suit on non-forum related claims in every state where a member of the student body resides. Thus, the fact that residents of the state apply and are accepted for admission to St. George's is of no moment."); *Am. Univ. Sys., Inc. v. Am. Univ.*, 858 F. Supp. 2d 705, 713-14 (N.D. Tex. 2012) ("In similar cases involving the issue of personal jurisdiction over an out-of-state educational institution, courts have unanimously determined that the institution is not subject to general personal jurisdiction where its only contacts with the forum state are its involvement in activities that are typical of a nationally prominent university."); *Richards v. Duke Univ.*, 480 F. Supp. 2d 222, 230 (D.D.C. 2007) (recruiting students, raising funds, participating in events, hosting faculty, and conducting government relations and lobbying in the District of Columbia was insufficient to establish general jurisdiction); *Scherer v. Curators of Univ. of Missouri & Law Sch. Admission Council*, 152 F. Supp. 2d 1278, 1282 (D. Kan. 2001) ("As an initial matter, plaintiff has directed the court to no case in which a university from a nonforum state has been held subject to the general

---

[3] Indeed, as in *Meyer*, the relevant facts in *Isaacs* bear remarkabe similarity to the case at bar. In *Isaacs*, Dartmouth College demonstrated that it was not "authorized to do business in the state of Pennsylvania, it d[id] not maintain an office or facility in Pennsylvania, it ha[d] no officers or employees in the state, it maintain[ed] no registered agent for service of process in Pennsylvania, it d[id] not advertise in any Pennsylvania publication, it d[id] not maintain a bank account, post-office box, or phone listing in Pennsylvania, it d[id] not obtain direct revenue from products sold or services rendered in Pennsylvania, it d[id] not own any real property in Pennsylvania, and no activities of Dartmouth College [were] controlled by any entity located in Pennsylvania." *Isaacs*, 2015 WL 1534362, at *12.

9

jurisdiction of a forum state and, in fact, every case which the court has uncovered holds directly to the contrary.") (collecting cases).

Not only do Plaintiffs fail to make any factual allegation that might distinguish this case from the myriad of cases holding that national universities are not subject to general jurisdiction outside of their state of incorporation or operation; they fail to grapple at all with this well-developed and plainly relevant body of case law. The Court sees no reason to disturb what is a well-established rule within this district. *See, e.g., Kurzon LLP v. Thomas M. Cooley Law Sch.*, 12-cv-8352 (LTS) (RLE), 2014 WL 2862609, at *4 (S.D.N.Y. June 24, 2014) (no general jurisdiction where Michigan law school solicited donations from New York alumni, solicited business in New York, sent representatives to school fairs in New York, and offered a small number of externships in New York); *Weil v. Am. Univ.*, No. 07 CIV. 7748 (DAB), 2008 WL 126604, at *4 (S.D.N.Y. Jan. 2, 2008) (no general jurisdiction where District of Columbia university had no contacts with New York beyond those "commonly engage[d]" in by universities and colleges).

Plaintiffs' argument that this Court assert general personal jurisdiction over OTS fails for substantially similar reasons. OTS, like Duke, is incorporated and has its principal place of business in North Carolina. It is an educational and research organization that draws its members and student-participants from across the county. OTS does, however, draw two of its fifty-five constituent members from New York. But without an allegation that these constituent members act as OTS' agents, that is insufficient to establish general jurisdiction. For instance, in *Selman v. Harvard Med. Sch.*, 494 F. Supp. 603, 610 (S.D.N.Y.) *aff'd sub nom. Burton Selman v. Harvard Med. Sch.*, 636 F.2d 1204 (2d Cir. 1980), the Court concluded that it lacked general jurisdiction over the Association of American Medical Colleges ("AAMC"), which drew twelve

10

of its 125 constituent members from New York. The AAMC was a non-profit, Illinois corporation with its only offices located in Washington, DC. *Id.* Although the AAMC was involved in the process of soliciting New York students to attend medical school, the organization "own[ed] no property, ha[d] no office, bank account, or telephone listing in New York, "[was] not qualified to do business in New York State and ha[d] not designated an agent for service of process" in New York. *Id.*

In sum, Plaintiffs have failed to establish general jurisdiction as to either Duke or OTS. Plaintiffs have cited no fact indicating that these North Carolina-based entities are "essentially at home" in New York. *See Daimler*, 134 S.Ct. at 761. Rather they rely exclusively on the kinds of intermittent and minimal contacts that Duke and OTS both have with many, if not nearly all, states in the country. "None of the activities of any the defendants is so tied with the state of New York to render general jurisdiction appropriate." *Chatwal Hotels & Resorts LLC*, 2015 WL 539460, at *4.

### B.    Specific Jurisdiction

Specific jurisdiction is governed by CPLR § 302(a), which empowers New York courts to exercise jurisdiction over non-domiciliaries when the causes of action in the case "aris[e] from" one of four specific kinds of contact with New York, including:

(1) the transaction of any business within the state or contracts anywhere to supply goods or services in New York;

(2) the commission of a tortious act within this state;

(3) the commission of a tortious act without the state causing injury within the state so long as the tortfeasor either (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or

11

consumed or services render, in New York or (ii) expects or should reasonably expect

the act to have consequences in the state and derives substantial revenue from

interstate or international commerce; or

(4) the ownership, use, or possession of any real property within New York.

*See* N.Y. CPRL § 302(a)(1)-(4).

Plaintiffs allege that the first three of these subsections provide a basis for jurisdiction

over the Defendants. The Court analyzes each in turn.

### 1.    Section 302(a)(1): Transaction of Business Within New York

"To determine the existence of jurisdiction under section 302(a)(1), a court must decide

(1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause

of action 'aris[es] from' such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d

239, 246 (2d Cir. 2007) (quoting *Deutsche Bank Sec., Inc. v. Montana Bd. of Invs.,* 7 N.Y.3d 65,

71 (2006)). Plaintiffs claim that they meet both prongs of this test because their claims against

Duke and OTS arise out of the contracts they signed, at home in New York, that allowed Ravi to

participate in OTS' programming in Costa Rica. *See* Roshni Thackurdeen Decl., Ex. 5; Raj

Thackurdeen Decl., Ex. 1. Plaintiffs contend that "[i]f not for" these contracts, "Ravi would not

have attended and subsequently died at Playa Tortuga." *See* Pls.' Opp. 15.

While it is likely true that the contracts served as a causal link in the chain of events

leading to Thackurdeen's death, this *sine qua non* argument misstates what it means for a cause

of action to arise from New York contacts. As the Second Circuit has explained, "[a] suit will be

deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a

substantial relationship, between the claim asserted and the actions that occurred in New York."

*Best Van Lines,* 490 F.3d at 246 (quoting *Henderson v. INS,* 157 F.3d 106, 123 (2d Cir. 1998).

12

Importantly, the "'arising from' prong of section 302(a)(1) does not require a causal link, but rather requires 'a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former . . .'" *Ingenito v. Riri USA, Inc.*, 11-cv-2569 (MKB), 2015 WL 874130, at *10 (E.D.N.Y. Mar. 3, 2015) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013)). Accordingly, the fact that contracts signed in New York served as "a link in the chain of causation leading to plaintiff's claims" is not itself sufficient for purposes of section 302(a)(1). *Faherty v. Fender*, 572 F. Supp. 142, 147 (S.D.N.Y. 1983). *See also* Jack B. Weinstein, et al., New York Civil Practice: CPLR ¶ 302.04 (2d ed. 2013) ("Weinstein") ("The courts have refused to find that a cause of action arises out of defendant's activities within the state merely because the defendant had a contact with New York that was a link in the chain of events leading to the claim for which relief is sought. Something more is needed.")

Indeed, courts are particularly reticent to find that a claim arose from New York contacts where, as here, a "New York contract was a but-for cause of an out-of-state, non-commercial tort." *Torres v. Monteli Travel, Inc.*, 09-cv-2714 (ARR) (SMG), 2011 WL 2670259, at *9 (E.D.N.Y. July 7, 2011) (finding section 302(a)(1) did not provide jurisdiction for salsa band's intentional tort claims occurring on a cruise ship off the coast of Florida where the contract to perform on the ship was signed in New York). Indeed, "courts in New York consistently have held that injuries sustained while participating outside the state in recreational activities advertised and contracted for within the state, bear too remote a relationship to the advertising and contractual activity claimed to be the transaction of business in the state to warrant a conclusion that the injuries arose from the in-state activity." *Diskin v. Starck*, 538 F. Supp. 877, 880 (E.D.N.Y. 1982).

13

The quintessential case on this point is *Gelfand v. Tanner Motor Tours, Ltd.*, 339 F.2d 317, 321-22 (2d Cir. 1964). In that case, the plaintiff purchased bus tickets in Long Island, New York and subsequently suffered injuries when the bus crashed while driving between Nevada and Arizona. Despite having purchased the tickets in New York, the plaintiff's negligence claims were held not to "arise from" this transaction because "[t]he alleged negligence of defendants, the subsequent injury to plaintiffs, and every relevant occurrence connecting these two events, all took place three thousand miles from Long Island, New York." *Id.* at 321. *See also Sedig v. Okemo Mountain*, 204 A.D.2d 709, 710–11 (N.Y. App. Div. 1994) ("[P]laintiff's tort claim, originating from a ski slope injury in Vermont, is too remote from the defendant's alleged sales and promotional activities to support long-arm jurisdiction under CPLR 302(a)(1).")

Plaintiffs' case falls well within this well-established rule. While it is true that the contracts signed in New York were a factual precursor to Thackurdeen's tragic death, the gravamen of the complaint focuses squarely on events occurring in Costa Rica. Plaintiffs do not allege breach of contract, fraud, or any kind of commercial tort stemming from the contracts. *See Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757 (2d Cir. 1983) ("Section 302(a)(1) is typically invoked for a cause of action against a defendant who breaches a contract with plaintiff or commits a commercial tort against plaintiff in the course of transacting business or contracting to supply goods or services in New York.") Not a single element of the parties' claims for negligence and intentional infliction of emotional distress relates to or concerns the New York contracts. *See Licci*, 732 F.3d at 169 (citing *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 341 (2012)) ("[S]ection 302(a)(1) does not require that every element of the cause of action pleaded must be related to the New York contacts . . . where at least one element arises from the

14

New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under the statute.") Accordingly, Plaintiffs' claims do not arise from the contracts they signed in New York for purposes of the long-arm statute. Section 302(a)(1) does not provide a basis for personal jurisdiction over the Defendants in this case.

## 2. Section 302(a)(2): Tortious Conduct Within New York

Plaintiffs contend that "tortious infliction of emotional distress occurred within New York," *see* Opp. 20, and that this Court therefore has jurisdiction over the intentional infliction of emotional distress claim under section 302(a)(2). As an initial matter, it is plain that a majority of the conduct undergirding the intentional infliction of emotional distress claim occurred exclusively in Costa Rica. This includes the alleged negligent transport of Thackurdeen's corpse (which his parents observed in Costa Rica), the delay in informing the Thackurdeens about Ravi's disappearance, the allegedly deficient search effort, and the continuation of the OTS end-of-semester celebratory events. *See* Compl. ¶¶ 18-23; 54-60. But Plaintiffs also contend that Assistant Vice Provost Riley's call to them at home in New York on April 29, 2012 was a source of emotional distress. *Id.* ¶ 18. Although not entirely clear in the complaint, the call in question appears to have been placed by Riley either from Durham, North Carolina or Costa Rica. *Id.* ¶¶ 18-22. Despite being placed outside the state, Plaintiffs contend that the call occurred within New York for purposes of section 302(a)(2) because it was "specifically directed at Plaintiffs in New York, where OTS [and] Duke w[ere] fully aware that [it] would cause severe emotional harm." *See* Opp. 21. The Court rejects this argument.

Prior to its amendment in 1966, the New York long-arm statute was consistently read to "cover[] only a tortious act committed (by a nondomiciliary) in this State." *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 464 (1965). Since then, a small number

15

of lower state courts have, on narrow grounds, expanded the rule to recognize that "not all tortious acts that occur within the State of New York need be committed while the defendant is physically present within New York boundaries for purposes of CPLR § 302(a)(2)." *Davidoff v. Davidoff*, 819 N.Y.S.2d 209, at *8 (Sup. Ct. 2006).

Nonetheless, the Second Circuit continues to adhere to the traditional, stricter rule. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 790 (2d Cir. 1999) (reaffirming that a "defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)"). The endurance of the rule is further reflected by the lion's share of district court opinions on the subject. *See, e.g., DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 418 (S.D.N.Y. 2010) (quoting *Bank Brussels Lambert,* 171 F.3d at 789–9) ("New York courts and the Second Circuit have consistently interpreted § 302(a)(2) jurisdiction narrowly and have held that to qualify for jurisdiction under this subsection, a defendant'[s act or omission [must have] occur[red] within the State.") (collecting cases); *Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameries*, 03-cv-1681(LAP), 2004 WL 2199547, at *12 (S.D.N.Y. Sept. 29, 2004) (citing *Bensusan Restaurant Corp. v. King,* 125 F.3d 25, 29 (2d Cir. 1997)) ("The Second Circuit has interpreted § 302(a)(2) to require that the tortious act itself physically be performed within New York State.") (internal marks and quotations omitted); *Japan Press Serv., Inc. v. Japan Press Serv., Inc.*, 11-cv-5875 (SJF) (ETB), 2013 WL 80181, at *9 (E.D.N.Y. Jan. 2, 2013) ("Section 302(a)(2) confers personal jurisdiction over a non-domiciliary defendant only when they commit acts within the state."); *Roth v. El Al Israel Airlines, Ltd.*, 709 F. Supp. 487, 490 (S.D.N.Y. 1989) ("Section 302(a)(2) requires that the tort be committed in New York and defendant must actually be in New York when the tort is committed.")

In light of controlling Second Circuit precedent, the Court is required to apply the majority rule requiring the defendant to physically commit the tortious act within New York. *See Bank Brussels Lambert*, 171 F.3d at 790. *Accord Stein v. Annenberg Research Inst.*, 90-cv-5224 (LLS), 1991 WL 143400, at *3 (S.D.N.Y. July 19, 1991) (citing *Fox v. Boucher,* 794 F.2d 34 (2d Cir. 1986)) (observing that "[i]n contrast to the conflicting authority in the state courts, the federal cases construing § 302(a)(2) . . . have uniformly held that jurisdiction under the section cannot be predicated on telephone calls made or letters mailed into this State.")  Plaintiffs have not directed the Court to any allegation that Defendants' New York contacts bore any relation to the intentional infliction of emotional distress claim beyond the incidental fact that Plaintiffs were physically located in the state when they received the call from Riley.  But the residence or domicile of the plaintiff alone is not sufficient to establish that a defendant's tortious conduct occurred in New York. *See Hartman v. Low Sec. Corr. Inst. Allenwood*, 03-cv-5601 (DLC), 2004 WL 34514, at *2 (S.D.N.Y. Jan. 7, 2004).

Finally, even if the Court were, *arguendo*, to consider Plaintiffs' argument under the more lenient rule, that standard would command the same outcome.  Of the small number of courts applying the more lax rule, those to consider intentional infliction of emotional distress claims have concluded that the defendants' "tortious conduct, that is, the alleged extreme and outrageous conduct of defendants[,] occurred in [the forum], where they were located when they" engaged in the conduct giving rise to the claim. *See Davidoff*, 819 N.Y.S.2d at *10. *See also* Weinstein ¶ 302.11 n.7 ("Tortious interference and intentional infliction of emotional distress occurs at the site of the acts"). In *Davidoff*, the defendants, who resided in Florida, were alleged to have uploaded demeaning photographs and comments about the plaintiff to a website via their personal computers. *See Davidoff*, 819 N.Y.S.2d at *2-3. The plaintiff then viewed the

harmful material on his own computer in New York. *Id.* at \*3. Despite adopting the more liberal reading of section 302(a)(2), the Court nonetheless concluded that the defendants' conduct could only be considered to have occurred in Florida, because that was "where they were located when they accessed the Website's Hosting Company and typed in the allegedly offensive materials onto plaintiff's Website." *Id.* at \*10. Analogously, Riley was located in either North Carolina or Costa Rica when making the allegedly tortious phone call. She therefore both accessed the telephone and telephone lines outside of New York and gave voice to her allegedly tortious remarks outside of the state. Accordingly, Plaintiffs' intentional infliction of emotional distress claim cannot satisfy either interpretation of section 302(a)(2).

### 3.    Section 302(a)(3): Tortious Conduct Without New York

The final long-arm statute provision upon which Plaintiffs rely is section 302(a)(3), which extends the state's jurisdiction over those who "commit[] a tortious act without the state causing injury to person or property within the state." "The conferral of jurisdiction under this provision rests on five elements: First, that defendant committed a tortious act outside the state; second, that the cause of action arises from that act; third, that the act caused injury to a person or property within the State; fourth, that defendant expected or should reasonably have expected the act to have consequences in the State; and fifth, that defendant derived substantial revenue from interstate or international commerce." *In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 341 (S.D.N.Y. 2000) (quoting *LaMarca v. Pak–Mor Mfg. Co.,* 95 N.Y.2d 210, 214 (2000)).

There is little dispute that the Plaintiffs meet the first two elements of this test. The complaint plainly alleges tortious conduct in Costa Rica and Plaintiffs' claims are firmly rooted in those allegations. *See* Compl. ¶¶ 14-23; 28-32; 43-53. Plaintiffs contend that they also meet the third element as to each of their claims because "the injuries from these tortious acts occurred

18

in New York [where] Plaintiffs, while at home . . . immediately suffered the permanent loss of consortium, support, and companionship of their son when OTS [and] Duke's negligence caused Ravi's drowning." *See* Opp. 16. In other words, Plaintiffs rely upon their own residence in New York as a basis for exerting personal jurisdiction over Duke and OTS for purposes of their negligence claims.

Analysis of where Plaintiffs' alleged injuries occurred differs slightly as between their first two claims, for survival in negligence and wrongful death in negligence, as compared to their third claim for intentional infliction of emotional distress. As to the negligence claims, the complaint does not clearly allege that the Plaintiffs experienced these harms at home in New York. Rather, the pleadings reveal that the Thackurdeens were called at home on April 29, 2012 by a Duke administrator who first informed them that their son was missing. *See* Compl. ¶ 18. The Thackurdeens then proceeded to the airport where they called the administrator, who told them that "everything was fine." *Id.* ¶ 19. Only upon arriving in Costa Rica did the family discover the true nature of the situation and it was similarly in Costa Rica where the family learned that they had tragically lost their son. *Id.* ¶¶ 20-23. Accordingly, a plain reading of the complaint suggests that it was in Costa Rica that Plaintiffs first suffered the "*permanent* loss of consortium, support, and companionship of their son," *see* Opp. 16 (emphasis added), as compared to several days prior in New York when they believed him to be missing. While Plaintiffs undoubtedly continued to experience pain and suffering from Ravi's death upon their return to New York, a litigant may not carry an injury home for purposes of section 302(a)(3). *See Hamilton v. Garlock, Inc.*, 31 F. Supp. 2d 351, 358 (S.D.N.Y. 1998) (concluding that section 302(a)(3) "prevent[s] parties from carrying injuries that occurred out of state back to New York in order to bring suit.") (citation omitted); *Domond v. Great Am. Recreation, Inc.*, 116 F. Supp.

19

2d 368, 374 (E.D.N.Y. 2000) (noting that while plaintiff "continues to suffer the damages resulting from that accident at her home in New York, the locus of the injury was not in the State of New York, and thus, outside the scope of CPLR § 302(a)(3)"); *Wilson v. Danka Corp.*, 01-cv-10592, 2002 WL 31929120, at *3 (S.D.N.Y. Jan. 28, 2003) ("The fact that the consequences of . . . alleged [tortious] acts may have continued in New York does not make New York the site of the [acts].")

Reading the complaint in the light most favorable to Plaintiffs and assuming that the Plaintiffs experienced a loss of consortium when they were first called by Assistant Vice Provost Riley on April 29, 2012, jurisdiction would still be inappropriate under section 302(a)(3). That is because, in "determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction [courts] must generally apply a situs-of-injury test, which asks them to locate the 'original event which caused the injury.'" *Bank Brussels Lambert*, 171 F.3d at 791 (quoting *Hermann v. Sharon Hosp., Inc.,* 135 A.D.2d 682, 683 (N.Y. App. Div. 1987)). "[T]he situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff." *Mareno v. Rowe*, 910 F.2d 1043, 1046 (2d Cir. 1990). "In other words, the situs of injury is where the critical events associated with the dispute occurred." *Int'l Telecom, Inc. v. Generadora Electricia del Oriente, S.A.*, 00-cv-8695 (WHP), 2002 WL 1072230, at *2 (S.D.N.Y. May 28, 2002). An injury "does not occur within the state simply because the plaintiff is a resident." *Mareno*, 910 F.2d at 1046. *See also Domond*, 116 F. Supp. 2d at 373-74 (citing *Bramwell v. Tucker*, 107 A.D.2d 731, 732-33 (N.Y. App. Div. 1985)) (holding that "mere residence or domicile in New York of an injured plaintiff does not constitute injury within the state for the purpose of establishing jurisdiction under CPLR 302(a)(3) where the injury occurred elsewhere.")

20

Moreover, in wrongful death actions specifically, "the courts have consistently held that the situs of injury is the place of the decedents' underlying injury or death, regardless of where the survivors may reside." *See* Weinstein ¶ 302.12 (explaining further that "courts have consistently held that pain and suffering or discovery of damages in New York after the injury occurs in another location will not suffice"). The case of *Lipin v. Bergquist*, 574 F. Supp. 2d 423, 432 (S.D.N.Y. 2008) is illustrative. In *Lipin*, the *pro se* plaintiff alleged that, *inter alia*, she experienced emotional and economic injury in New York after the death of her father in Stockholm, Sweden. The court rejected jurisdiction under section 302(a)(3) because the "only arguable basis for the existence of such an injury would be Plaintiff's residence in New York and Plaintiff's subsequent 'experience' of economic and/or emotional injury in this state." *Id.* Such is the case here. Accordingly, although Plaintiffs surely experienced grief from their loss of consortium with Ravi in New York, their injury, for purposes of their negligence claims, occurred in Costa Rica. *See Fantis Foods, Inc. v. Standard Importing Co.*, 49 N.Y.2d 317, 326 (1980) ("It has, however, long been held that the residence or domicile of the injured party within a State is not a sufficient predicate for jurisdiction, which must be based upon a more direct injury within the State and a closer expectation of consequences within the State . . .")

Applying the situs-of-injury test to Plaintiffs' intentional infliction of emotional distress claim commands the same result under section 302(a)(3). The "original event" which caused Plaintiff's emotional distress was the tragic death of their son, which occurred in Costa Rica. Again, viewing the chronology of events as favorably as possible for Plaintiffs, the phone call made to the Thackurdeens by Riley could alternatively be considered the original event leading to the Plaintiffs' emotional distress injuries, but there too the original event causing the injury occurred outside of New York. *See Mareno*, 910 F.2d at 1046 ("[T]he situs of the injury is the

21

location of the original event which caused the injury, not the location where the resultant damages are subsequently felt by the plaintiff.")

Even more importantly, all of the critical events concerning Plaintiffs' intentional infliction of emotional distress claim occurred in Costa Rica or North Carolina. The fact that Plaintiffs were *in situ* in New York at the time of Ravi's death is incidental to the claim. *See Int'l Telecom*, 2002 WL 1072230, at *2 ("In other words, the situs of injury is where the critical events associated with the dispute occurred.") Indeed, nearly all of the allegations undergirding the intentional infliction of emotional distress claim concern events transpiring in Costa Rica. *See* Compl. ¶ 55 (alleging that Defendants intentionally inflicted emotional distress through, *inter alia*, their "failure to provide adequate search teams, supplies, and resources to locate Ravi's body promptly leading to his body not being located or pulled out of the water for over 36 hours after his death, Defendants' celebration with the remaining students and the public dissemination of that celebration while Ravi had just drowned and while his body was still missing, and Defendants' careless handling and transportation of Ravi's dead body after it was eventually located.") Nothing about the Thackurdeens' residency in New York bears on the substance of the case. *See Shakour v. Fed. Republic of Germany*, 199 F. Supp. 2d 8, 16 (E.D.N.Y. 2002) (concluding injury occurred in Germany when all critical events of the case occurred there).

Plaintiffs contend that, at the very least, the phone calls on April 29, 2012 with Assistant Vice Provost Riley caused them injury within New York because that is where they received the calls. As an initial matter, regardless of whether a small number of telephone calls into New York is sufficient to establish personal jurisdiction under either the long-arm statute or constitutional due process, the fact that the Plaintiffs received a single telephone call from

22

Assistant Vice Provost Riley in New York does not alter the situs-of-injury analysis that controls where an injury is deemed to have occurred for jurisdictional purposes under section 302(a)(2). *See Bank Brussels*, 171 F.3d at 791 ("[C]ourts determining whether there is injury in New York sufficient to warrant § 302(a)(3) jurisdiction must generally apply a situs-of-injury test, which asks them to locate the original event which caused the injury.") (internal quotations removed). As discussed, that test deems the situs of the injury to be "the place where the underlying, original event occurred which caused the injury." *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001). Based on the allegations in the complaint, that situs can only be either North Carolina or Costa Rica.

Plaintiffs do correctly note, however, that some courts have, under narrow sets of circumstances, deemed a plaintiff injured in New York by virtue of an out-of-state telephone call. *See, e.g.*, *Davis v. Masunaga Grp., Inc.*, 204 F. Supp. 2d 665, 666 (S.D.N.Y. 2002) (concluding that injury occurred within New York for purposes of section 302(a)(3) when defendant "made twenty telephone calls to plaintiff in New York State as part of a course of harassment"); *M.P. v. M.S.*, 186 Misc. 2d 173, 175 (N.Y. Fam. Ct. 2000) (holding that a death threat made to plaintiff in Florida constituted an injury in New York, because plaintiff's ongoing emotional distress—represents a serious, potentially long-term New York effect of an out-of-State act).

Nonetheless, other courts have expressed skepticism about the extent to which out-of-state telephone calls may satisfy personal jurisdiction, both under the long-arm statute and under constitutional due process. For instance, in *Fox*, the Second Circuit concluded that "it would offend minimum contacts due process principles" to oblige a Massachusetts resident to litigate a claim in New York on the basis of a sole telephone call into the state. *Fox*, 794 F.2d at 37.

23

*See also Beckett v. Prudential Ins. Co. of Am.*, 893 F. Supp. 234, 239 (S.D.N.Y. 1995) ("Because the Court finds that personal jurisdiction over Jack and Farrell based on one telephone call or letter to New York would not satisfy due process requirements, the Court need not determine the situs of the alleged injury to plaintiff to find that § 302(a)(3) is unavailable to plaintiff.")

In reference to the New York long-arm statute specifically, the *Fox* court explained that "[o]ne single telephone call made to New York State is insufficient contact to support a suit initiated in that forum against an out-of-state resident under either the contract or tort provisions of CPLR 302." *Fox*, 794 F.2d at 37. District courts within this Circuit have expressed similar doubts. *See Robinson*, 21 F.3d at 511 ("isolated phone call is an insufficient basis for personal jurisdiction over the individual defendants" under section 302(a)); *Eastboro Found. Charitable Trust v. Penzer*, 950 F. Supp. 648, 652 n.5 (S.D.N.Y. 2013) ("a single phone call [from outside New York] is jurisdictionally insignificant under C.P.L.R. §§ 301 and 302(a)").

The Court need not determine the sufficiency of a single phone call into the state for purposes of jurisdiction under section 302(a)(3) because, as explained, the situs-of-injury test establishes that, jurisdictionally-speaking, the injury arose outside of New York. The Court notes, however, that in those few cases finding jurisdiction under section 302(a)(3) on the basis of out-of-state phone calls, some particular element of the calls rendered the plaintiff's location in New York relevant to the situs-of-injury test, rather than incidental, as it is here. For instance, in *Davis*, the defendant's alleged pattern of harassment—calling the plaintiff at home over two dozen times—affected the situs-of-injury analysis by betraying a clear intent to harm the plaintiff at her home in New York. *See Davis*, 204 F. Supp. 2d at 662 & n.21. *Cf. Symmetra Pty Ltd. v. Human Facets, LLC*, 12-cv-8857 (SAS), 2013 WL 2896876, at *8 (S.D.N.Y. June 13, 2013) ("Although controlling precedent establishes that the e-mails that Turnbull sent to New York

24

companies cannot provide a self-sufficient basis for jurisdiction over this claim, it is relevant that Turnbull purposefully directed the disparaging e-mails to New York. Moreover, the situs of injury is New York, because the critical events giving rise to the injury took place in New York, and New York is where Symmetra suffered its [economic] injuries.") Comparatively, the single phone call made by Assistant Vice Provost Riley to the Thackurdeens was made irrespective of their location at the time of the call, *see* Compl. ¶ 18, and is not particularly significant for purposes of the situs-of-injury test. Accordingly, jurisdiction cannot be sustained for any of the Plaintiffs' claims under section 302(a)(3) because, although Plaintiffs certainly experienced a sense of loss and lingering grief within the state, their injury must be deemed to have occurred in either North Carolina or Costa Rica.

## IV.    CONCLUSION

In conclusion, Plaintiffs have failed to meet their burden of demonstrating that this Court has personal jurisdiction over the Defendants. Accordingly, the Court does not resolve the Defendants' due process arguments or their request to transfer venue. Duke and OTS' motions to dismiss are GRANTED. This resolves Dkt. Nos. 16, 27. The Clerk of Court is instructed to terminate the case.

SO ORDERED.

Dated:  Sept. 1    , 2015
        New York, New York

_____
ALISON J. NATHAN
United States District Judge