IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ROSHNI THACKURDEEN, and          )
RAJ B. THACKURDEEN,              )
                                 )
              Plaintiffs,        )
       v.                        )
                                 )          1:16CV1108
DUKE UNIVERSITY, and             )
ORGANIZATION FOR TROPICAL        )
STUDIES, INC.,                   )
                                 )
              Defendants.        )

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on a Motion for Judgment on the
Pleadings [Doc. #67] pursuant to Federal Rule of Civil Procedure 12(c) filed by
Defendant Duke University ("Duke") and a Motion to Dismiss, or in the alternative,
For a Judgment on the Pleadings [Doc. #71] pursuant to Federal Rules of Civil
Procedure 4(m) and 12(c) filed by Defendant Organization for Tropical Studies
("OTS"). For the reasons explained below, both Motions [Docs. #67, 71] will be
denied in part and granted in part. The time within which to serve Defendants has
been extended and, therefore, they were timely served. However, Plaintiffs'
negligence and wrongful death claims are barred pursuant to valid waiver and
release agreements. The intentional infliction of emotional distress claim against
both Duke and OTS remains.

I.

Plaintiffs Roshni Thackurdeen and Raj B. Thackurdeen filed the present
action, individually, and as co-administrators of their late son's estate. (Compl.

[Doc. #1] ¶ 1.) During the spring of 2012, their son, Ravi Thackurdeen, died while a student enrolled in the Global Health and Tropical Medicine Program ("Global Health Program" or "Global Health"), a college study abroad program, in Costa Rica. (Id. ¶¶ 10, 17.) At the time, Ravi had been a student at Swarthmore College in Pennsylvania. (Id. ¶ 9.) However, while attending the Global Health Program, he was enrolled at Duke and OTS. (Id. ¶ 10.)

The events giving rise to Ravi's death occurred at the end of the Global Health semester. (Id. ¶ 14.) On April 29, 2012, the students were taken on a "celebratory trip" to a beach in Playa Tortuga, Costa Rica. (Id. ¶¶ 14, 17.) According to the Complaint, Costa Rican beaches are rampant with "deadly rip currents" and Playa Tortuga is known for "dangerously strong rip currents and . . . swimming [there] was not advisable." (Id. ¶¶ 38, 39.) In addition, as with most Costa Rican beaches, there are no lifeguards on that beach. (Id.) Despite Duke and OTS taking Global Health students to Playa Tortuga for the three years prior to Ravi's death, the students on Ravi's trip did not have notice of the beach trip and it was not anywhere on the program's schedule. (Id. ¶¶ 14-15.) Further, the students "were told it was safe to swim" and were instructed to "swim parallel to the shore" if caught in a rip current. (Id. ¶ 15.) Ravi and a fellow student went swimming, but were caught in a rip current and pulled out to sea. (Id. ¶ 16.) The classmate was rescued, but Ravi was pulled over 300 yards away from shore by the rip current, and, after treading water for thirty minutes, he drowned. (Id. ¶¶ 16-17.)

On August 8, 2014, the Thackurdeens filed the present action asserting three claims against both Duke and OTS: (1) negligence, (2) wrongful death based on negligence, and (3) intentional infliction of emotional distress. (Id. ¶¶ 43-60.) In support of their negligence claims, the Thackurdeens allege that Duke and OTS failed to exercise reasonable care and breached their duty to Ravi by, among other things: taking the students to Playa Tortuga, a beach notorious for rip currents, failing to make inquiries regarding dangerousness and safety measures, failing to warn the students of the dangers of Playa Tortuga and swimming in the ocean, failing to request lifeguards, and failing to rescue Ravi. (Compl. ¶ 46.)

The Complaint was originally filed in the United States District Court for the Southern District of New York where the Thackurdeens live. (Id. ¶¶ 5-7.) After the United States Court of Appeals for the Second Circuit affirmed the Southern District of New York's dismissal of the action for lack of personal jurisdiction, the Second Circuit Court of Appeals ordered the case transferred to this district, (2nd Cir. Summ. Order [Doc. #52] (Sept. 1, 2016)), and, on September 7, 2016, it was transferred here, [Doc. #53]. The Clerk of Court issued summonses for Duke and OTS on January 5, 2017, [Docs. #60, 60-1], and the Defendants were served the same day [Docs. #68 at n.3, 72 at 6]. On February 24, 2017, Duke and OTS filed the present Motions.

II.

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed - but early enough not to delay trial - a party may move for judgment on the

pleadings." A motion for judgment on the pleadings pursuant to Rule 12(c) is analyzed under the same standard as a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss. Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 405–06 (4th Cir. 2002). A district court "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" Kensington Volunteer Fire Dept., Inc. v. Montgomery Cty., Md., 684 F.3d 462, 467 (4th Cir. 2012) (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., 637 F.3d 435, 440 (4th Cir. 2011)). A court may consider the pleadings and all written documents attached to the pleadings and "[t]he factual allegations in the answer are taken as true to the extent they have not been denied or do not conflict with the complaint." Mendenhall v. Hanesbrands, Inc., 856 F.Supp.2d 717, 724 (M.D.N.C. 2012).

### III.

Duke and OTS both move to dismiss the action based on the Thackurdeens' alleged failure to serve valid summons in a timely manner, and in the alternative, to dismiss the first two causes of action, negligence and wrongful death, because they are barred by contractual waiver and release.

### A.

In support of their motions, Duke and OTS both argue that, because the Thackurdeens failed to serve a valid summons on either Duke or OTS within the time required by Federal Rule of Civil Procedure 4(m), the action must be dismissed. Further, if the action is dismissed and refiled, the claims will be barred

-4-

by the applicable statute of limitations. Specifically, OTS asserts that

> Plaintiffs filed this suit in the Southern District of New York without
> any attempt to determine (or plead) that Duke and OTS would be
> subject to personal jurisdiction there. Plaintiffs then waited until after
> their claims had been dismissed to argue for the first time, on appeal,
> that this case should have been transferred instead. After transfer,
> Plaintiffs waited 120 days to have a new summons issued and
> attempt service, despite being fully aware of prior decisions from this
> circuit (and this Court) that warned them that immediate action was
> necessary.

(OTS's Br. [Doc. #72] at 8-9.) Duke makes essentially the same argument in

support of dismissal. (Duke's Mem. [Doc. #68] at 8-15.)

"Service of process, under longstanding tradition in our system of justice, is

fundamental to any procedural imposition on a named defendant." Murphy Bros.,

Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 350 (1999). "Before a federal

court may exercise personal jurisdiction over a defendant, the procedural

requirement of service of summons must be satisfied." Omni Capital Int'l, Ltd. v.

Rudolf Wolff & Co., 484 U.S. 97, 104 (1987). Under Federal Rule of Civil

Procedure 4(m),

> If a defendant is not served within 90 days after the complaint is filed,
> the court--on motion or on its own after notice to the plaintiff--must
> dismiss the action without prejudice against that defendant or order
> that service be made within a specified time. But if the plaintiff shows
> good cause for the failure, the court must extend the time for service
> for an appropriate period.

Fed. R. Civ. P. Rule 4(m). Rule 4(m) does not define "good cause," but it is

generally regarded to mean "reasonable and diligent efforts . . . to effect service

prior to the" deadline. Chen v. Mayor & City Council of Balt., 292 F.R.D. 288,

293 (D. Md. 2013) (citation omitted).

> Because the question of what constitutes "good cause" necessarily is determined on a case-by-case basis within the discretion of the district court, courts have declined to give it a concrete definition, preferring to analyze a number of factors. These include whether: 1) the delay in service was outside the plaintiff's control, 2) the defendant was evasive, 3) the plaintiff acted diligently or made reasonable efforts, 4) the plaintiff is pro se or in forma pauperis, 5) the defendant will be prejudiced, or 6) the plaintiff asked for an extension of time under Rule 6(b)(1)(A).

Scott v. Md. State Dep't of Labor, 673 F. App'x. 299, 306 (4th Cir.

2016)(unpublished).

In support of its Motion, Duke argues that the Thackurdeens have not met

the good cause standard. Specifically,

> [t]he Plaintiffs have exhibited a consistent pattern of neglect and delay, first in instituting litigation in a forum where there was no personal jurisdiction, next in failing to seek an order extending the time within which to issue a summons, and finally by waiting 120 days before seeking a summons. On transfer, the Plaintiffs were required to seek an order extending the time for the issuance and service of a valid summons. They did not do so. That extension, under the circumstances of this case and Rule 4(m), could not have been more than ninety days and should have been less. When the Plaintiffs delayed an additional 120 days to even seek a summons or to serve it—without an order extending time—the statute of limitations ran in the interim, barring the claims for wrongful death.

(Duke's Mem. at 13.) OTS makes a similar argument in support of dismissal.

(OTS's Br. at 7-8.)

In response, the Thackurdeens assert that they have shown good cause.

(Pls.' Joint Resp. to Duke's Mot. [Doc. #75] at 10; Pls.' Joint Resp. to OTS's Mot.

[Doc. #76] at 10.) In support of this contention, they submitted the affidavit of

Ben Meiselas, an attorney at Geragos & Geragos in Los Angeles. (Aff. of Ben Meiselas, Mar. 27, 2017 [Docs. #75-1, 76-1].) Mr. Meiselas avers that after this matter was transferred to the Middle District of North Carolina, his firm "immediately began searching for local counsel to assist . . . in the matter." (Id. ¶ 2.) According to Meiselas,

> Some factors that made finding local counsel in North Carolina difficult and time consuming were: (1) the fact that this matter had been ongoing for some time and that it accordingly had a very long procedural history, (2) the fact that this matter involves a death in a foreign country, and (3) the fact Duke University has a very expansive alumni network in the state of North Carolina, meaning that any and all firms considering becoming involved in this matter first had to conduct a scrupulous investigation to make sure that serving as local counsel would not create a conflict of interest.

(Id. ¶ 3.)

According to Meiselas, his firm contacted a local North Carolina attorney on September 8, 2016, the day after the case was transferred here. (Id. ¶ 4.) That attorney declined to take the case but recommended that Meiselas contact James A. Roberts III at Lewis & Roberts, PLLC. (Id.) After conducting research on Lewis & Roberts and other North Carolina firms, Meiselas' firm approached them to be local counsel and Lewis & Roberts subsequently conducted its own due diligence. (Id. ¶¶ 6,7.) On January 3, 2017, Lewis & Roberts agreed to serve as local counsel. (Id. ¶ 8.) The Clerk of Court for the Middle District of North Carolina issued summonses on January 5, 2017. (Id. ¶ 12, Summons [Docs. #60, 60-1].) Duke and OTS were served the same day. [Docs. #68 at n.3, 72 at 6.]

When applying the Fourth Circuit's Scott factors to the facts here, it is

determined that the Thackurdeens have not shown good cause for the delay. The delay in service was not outside their control; they are not pro se or in forma pauperis; and they did not ask for an extension of time under Rule 6(b)(1)(A). In addition, Duke and OTS were not evasive in any way. As to the two other factors, it is unclear whether or not Duke or OTS will be prejudiced and whether or not the Thackurdeens were diligent in their efforts to effect service. In addition, the Thackurdeens do not cite to any cases, nor is this Court able to locate any, that support a finding that difficulty in finding local counsel constitutes good cause.

However, the Supreme Court of the United States has recognized that district courts may enlarge time "even if there is no good cause shown." Henderson v. U.S., 517 U.S. 654, 662 (1996). Subsequently, the Fourth Circuit Court of Appeals acknowledged that the time for service could be enlarged even absent good cause.

> The Supreme Court recently observed that "Rule 4(m) [ … ] permits a district court to enlarge the time for service 'even if there is no good cause shown.'" Although this observation was not a holding by the Supreme Court, we regard the Court's statement as persuasive as to the meaning of Rule 4(m).

Scruggs v. Spartanburg Reg'l Med. Ctr., No. 98-2364, 198 F.3d 237 (Table), 1999 WL 957698, at *3 (4th Cir. 1999)(unpublished)(quoting Henderson, 517 U.S. at n. 5 (quoting Advisory Committee's Notes on 1993 Amendments to Fed. R. Civ. Proc. 4); see also Giacomo-Tano v. Levine, No. 98-2060, 199 F.3d 1327 (Table), 1999 WL 976481, at *1 (4th Cir. 1999) (unpublished) ("Even if a plaintiff does not establish good cause, the district court may in its discretion grant an extension of

time for service.")). In addition, district courts in the Fourth Circuit have addressed the "good cause" requirement under Rule 4(m) and found it not necessary post-Henderson. See, e.g., LHF Productions, Inc. v. Does, No. 3:16CV284, 2016 WL 7423094, at *6 (E.D. Va. Dec. 22, 2016) (finding that Rule 4(m) unambiguously permits an extension of time to serve process regardless of whether a plaintiff can show good cause). Further, the advisory notes to the 1993 Amendment of Federal Rule of Civil Procedure provide that

> [Rule 4(m)] explicitly provides that the court shall allow additional time if there is good cause for the plaintiff's failure to effect service in the prescribed 120 days, and authorizes the court to relieve a plaintiff of the consequences of an application of this subdivision even if there is no good cause shown. . . . **Relief may be justified, for example, if the applicable statute of limitations would bar the refiled action**, or if the defendant is evading service or conceals a defect in attempted service.

Fed. R. Civ. P. 4(m) advisory comm. nn.

Other district courts have addressed this issue in similar contexts. In Bolus v. Fleetwood RV, Inc., 308 F.R.D. 152 (M.D.N.C. 2015), the court extended time for service despite not finding good cause. Id. at 158. The facts in Bolus are similar to the case at hand. The case was transferred due to lack of personal jurisdiction after which the plaintiff did not engage local counsel until late into process. Id. at 157-58. The defendant had been served the complaint and summons in the initial district, the defendant successfully challenged personal jurisdiction, and the plaintiff was well aware the case was transferred to the new jurisdiction. Id. In Bolus, the court addressed the issue under the "excusable

neglect" standard as the plaintiff had moved for an extension of time to serve defendants. The Bolus court held the circumstances supported a finding of excusable neglect because "any the prejudice that the passage of those six months [since the case was transferred] may have caused to [Defendants'] ability to defend themselves is outweighed by the other factors." Id. The "other factors" included: (1) defendants had been served in the initial district, (2) plaintiff's attorney failed to secure local counsel despite promising to do so, (3) plaintiff took it upon himself to find local counsel and had trouble doing so, but ultimately did, and (4) new counsel "promptly attempted to remedy some of these failures." Id. Accordingly, the Bolus court allowed an extension of time for Mr. Bolus to serve the defendants. Id. However, before he was allowed to do so, the court found that "considering [Mr. Bolus'] failure to prosecute the case, he must first pay all three Defendants' reasonable attorneys' fees associated with their moving to dismiss due to Mr. Bolus's failure to prosecute . . . ." Id.

In Vergis v. Grand Victoria Casino & Resort, 199 F.R.D. 216 (S.D. Ohio 2000), the court found that it could grant an extension of time to serve the summons even absent a showing of good cause. The Vergis court explained,

> three factors weigh in favor of granting Plaintiff a modest extension of time in which to re-serve the summons and complaint. The first is that Plaintiff's cause of action will be barred by the statute of limitations if it is dismissed now. Granting an extension in this circumstance is clearly contemplated by the new rule [4(m)]. Second, Grand Victoria obviously had notice of the lawsuit prior to the expiration of the 120 day service period and thus will not be unfairly surprised by having to defend this action. See Henderson, 517 U.S. at 671 ("[T]he core function of service is to supply notice of the pendency of a legal

action, in a manner and at a time that affords the defendant a fair opportunity to answer the complaint and present defenses and objections."). Finally, granting Plaintiff an extension of time to re-serve the summons and complaint in this particular circumstance would be in keeping with the overall policy in this Circuit of resolving disputes on their merits, rather than disposing of them on procedural or technical grounds.

Id. at 218.

Under the totality of the circumstances here, the Court will grant an extension of time for the Thackurdeens to serve Defendants with the summons and complaint, even absent a showing of good cause. The Thackurdeens undertook concerted efforts to find local counsel; Duke and OTS have been on notice since the lawsuit was originally filed in the Southern District of New York; and it is likely that the action, if refiled, would be barred by a statute of limitations. Therefore, a time extension, rather than dismissal without prejudice, is appropriate. Accordingly, the time to serve the summons and complaint upon each Defendant is extended by an additional thirty-five (35) days from the date this action was transferred to the Middle District of North Carolina on September 7, 2016. See, e.g., Fields v. Norfolk & Southern Ry. Co., 924 F. Supp. 2d 702, 710 (S.D.W.Va. 2012) (finding an extension of time for service of summons appropriate, even absent good cause, and allowing the time for service to "be extended to accommodate the actual service which has now been effectuated upon Defendant."). Because Duke and OTS are deemed to have been timely served, their Motions to Dismiss on this basis are denied.

**B.**

Duke and OTS next argue that the Thackurdeens' claims for negligence and wrongful death were contractually waived and released by Ravi and his father prior to his leaving for the Global Health Program. (OTS's Br. at 9; see also Duke's Mem. at 15.) When Ravi was accepted to the Global Health Program, he and his father signed the "Statement of Authorization and Consent" for Duke ("Duke waiver"), [Docs. #66-3, 70-2], and the "OTS Participation Agreement – Costa Rica" ("OTS waiver"), [Docs. #66-4, 70-1]. The Duke waiver states, in part:

### Statement of Authorization and Consent

> We understand that participation in the program is voluntary and that any program of travel involves some element of risk. We agree that in partial consideration of Duke University sponsoring this activity and permitting the student to participate, we will not attempt to hold Duke University, its trustees, officers, agents and employees liable in damages for any injury or loss to person or property the student might sustain while so participating; and we hereby release Duke University, its trustees, officers, agents and employees from any liability whatsoever for any personal injury . . . arising from participation in the program.

(Duke Statement of Authorization and Consent [Docs. #66-3 at 2, 70-2 at 1].) The OTS waiver provides, in part:

### Release, Assumption of Risk, Waiver of Liability, and Hold Harmless Agreement

> In return for the Organization for Tropical Studies and Duke University allowing me to participate in this activity and having read and understood this Participation Agreement, I hereby state that I agree to the following:
>
> A. I hereby RELEASE, WAIVE, DISCHARGE, AND COVENANT

NOT TO SUE the Organization for Tropical Studies, Duke University, its trustees, officers, employees, or agents (hereinafter referred to as RELEASEES) . . . for any liability, claim and/or cause of action arising out of or related to any loss, damage, or injury, including death, that may be sustained by me . . . that occurs as a result of my traveling to and from, and participation in this activity.

B. I agree to INDEMNIFY AND HOLD HARMLESS the RELEASEES whether injury or damage is caused by my negligence, the negligence of the RELEASEES, or the negligence of any third party from any loss, liability, damages or costs, including court costs and attorneys' fees, that RELEASEES may incur due to may traveling to and from, and participation in this activity.

C. It is my express intent that this RELEASE and HOLD HARMLESS AGREEMENT shall bind the members of my family . . . if I am alive, and my heirs, assigns and personal representative, if I am deceased, and shall be deemed as a RELEASE, WAIVER, DISCHARGE, and COVENANT NOT TO SUE the above-named RELEASEES.

F. I understand that by participating in this activity I will ASSUME THE RISK of injury and damage from risks and damages that are inherent in any activity.

(OTS Participation Agreement – Costa Rica [Docs. #66-4 at 3, 70-1 at 2].) Both

waivers were signed by both Ravi and Mr. Thackurdeen on October 14, 2011.

[Docs. #66-3 at 3, 66-4 at 3, 70-1 at 2, 70-2 at 2.]

The Thackurdeens argue that their claims are not barred by the doctrines of

waiver and release because: (1) claims for gross negligence cannot be released

under North Carolina law, (2) the claims fall outside the scope of the releases, and

(3) the releases violate a substantial public interest and are, therefore,

unenforceable. (Pls.' Joint Resp. to Duke's Mot. at 13-19; Pls.' Joint Resp. to

OTS's Mot. at 13-19.)

**1.**

The Thackurdeens first argue that their claims for gross negligence cannot be released under North Carolina law. Of note, the Thackurdeens do not title any of their claims "gross negligence". Their argument regarding gross negligence first appears in their Responses to Duke's and OTS's Motions to Dismiss. As the Complaint does not include a specific gross negligence claim and the Defendants are not moving to dismiss the third claim (intentional infliction of emotional distress) pursuant to the doctrines of waiver and release, the Court will address this argument with regard to only the first two claims, negligence and wrongful death. As North Carolina courts have not definitively ruled on this issue, the Court will first determine if the Thackurdeens have stated a claim for gross negligence. See, e.g., Bertotti v. Charlotte Motor Speedway, Inc., 893 F. Supp. 565, 569 (W.D.N.C. 1995) (noting that North Carolina courts have not addressed the issue and declining to do so because plaintiff did not introduce evidence sufficient to establish gross negligence).

However, there is an initial choice of law issue that must be addressed. "A district court sitting in a diversity action must apply the law of the forum state including its choice of law rules. In tort actions, North Carolina courts adhere to the rule of lex loci and apply the substantive laws of the state in which the injuries were sustained." Johnson v. Holiday Inn of America, Inc., 895 F. Supp. 97, 98 (M.D.N.C. 1995) (internal citations omitted). "In determining the place of the tort, North Carolina courts apply the generally accepted interpretation of the lex loci rule

that the tort is deemed to have occurred where the last event takes place that is necessary to render the actor liable." Santana, Inc. v. Levi Strauss & Co., 674 F.2d 269, 272 (4th Cir. 1982) (internal citations omitted). "Injury being the last element of a tort, [the] North Carolina rule, in a nutshell, is the law of the place of injury." Id.

As Ravi's death occurred in Costa Rica, lex loci instructs that Costa Rican law governs the tort claims. However, no party has raised the issue of Costa Rican law governing the causes of action. Federal Rule of Civil Procedure 44.1 provides,

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

Fed. R. of Civ. P. 44.1. Rule 44.1 grants federal courts "broad authority to conduct their own independent research to determine foreign law but imposes no duty upon them to do so." Baker v. Booz Allen Hamilton, Inc., 358 F. App'x 476, 481 (4th Cir. 2009) (unpublished) (citing Carey v. Bahama Cruise Lines, 864 F.2d 201, 205 (1st Cir.1988)); accord Riffe v. Magushi, 859 F. Supp. 220, 223 (S.D.W.Va. 1994). As a result, "the party claiming foreign law applies carries both the burden of raising the issue that foreign law may apply in an action and the burden of proving foreign law to enable the district court to apply it in a particular case." Baker, 358 F. App'x at 481. "Where a party fails to satisfy either burden,

the district court should apply the forum state's law." Id. (citing Ferrostaal, Inc. v. M/V Sea Phoenix, 447 F.3d 212, 216 (3rd Cir. 2006)). See also Mzamane v. Winfrey, 693 F. Supp. 2d 442 (E.D. Pa. 2010) ("where the parties do not satisfy both of these burdens, the law of the forum will apply"). In the present action, no party has met its burden of raising the issue of foreign law or adequately proving what that foreign law would be. As such, in determining whether or not the Complaint states a claim for gross negligence, this Court will apply the law of the forum, North Carolina. See Mzamane, 693 F. Supp. 2d at 475 ("As neither party provided any authority as to the tort of false light invasion of privacy under South African law, the Court concludes that Rule 44.1 has not been satisfied. Therefore . . . Pennsylvania law will apply.")

North Carolina defines gross negligence as "wanton conduct done with conscious or reckless disregard for the rights and safety of others." Yancey v. Lea, 550 S.E. 2d 155, 158 (N.C. 2001).

> In order to state a claim for gross negligence, a plaintiff must allege . . . (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the breach was a proximate cause of the injury; (4) the plaintiff was injured as a result thereof and (5) the defendant's conduct was willful, wanton, or done with reckless indifference. Willful conduct is done with a deliberate purpose. Conduct is willful when it is carried out with a wicked purpose or with reckless indifference.

Ross v. Tennessee Commercial Warehouse, Inc., No. 3:14-cv-00391, 2014 WL 4672424 at *2 (W.D.N.C. Sept. 18, 2014) (quoting Simpson v. Amylin Pharms., Inc., et al., No. 1:11–cv–301, 2012 WL 3240142, at *3 (W.D.N.C. Aug. 7, 2012)

(citing Sawyer v. Food Lion, Inc., 549 S.E.2d 867 (N.C. Ct. App. 2001)).  The North Carolina courts have found that "the difference between negligence and gross negligence lies in the intentional or deliberate character of the actions of the defendant that are done purposefully and with the knowledge that the action is a breach of duty to plaintiff."  Id. (quoting Simpson, 2012 WL 3240054, at *2 (citing Yancy, 550 S.E.2d at 157).  For example, the North Carolina Supreme Court found the allegations sufficient to support a claim for gross negligence where the plaintiffs alleged that the North Carolina Department of Transportation ("NCDOT") had a statutory duty to inspect the roads and failed to inspect the road ultimately resulting in a fatal car accident.  Ray v. North Carolina Dept. of Transp., 727 S.E.2d 675 (N.C. 2012).  In coming to this conclusion, the Ray court found that the amount of time since the development of the road defect that caused the accident indicated an intentional avoidance by the NCDOT of inspecting that road.  (Id. at 684.)  This intentional behavior, coupled with the NCDOT's knowledge that uninspected roads can be dangerous, was sufficient to support a gross negligence claim.  (Id.)

The Thackurdeens assert a claim for negligence and a claim for wrongful death.  In their negligence claim, the Thackurdeens allege that Duke and OTS failed to exercise reasonable care and breached their duty to Ravi, by, amoung other things:

1.  Taking their students to Playa Tortuga, a beach with notoriously deadly rip currents and no lifeguards on duty.

2. Allowing their students to swim in Playa Tortuga, a beach with notoriously deadly rip currents and no lifeguards on duty.

3. Failing to make reasonable and necessary inquiry into the dangerousness of Playa Tortuga prior to taking their students there.

4. Failing to make the proper risk evaluations of Playa Tortuga prior to taking their students there.

5. Failing to make reasonable inquiry into safe alternatives to Playa Tortuga prior to taking their students there.

6. Failing to warn their students of the dangerous conditions of Playa Tortuga.

7. Failing to warn their students of the dangers of swimming in Playa Tortuga, a beach with notoriously deadly rip currents.

8. Failing to create and implement an emergency plan for potential dangers at Playa Tortuga.

9. Failing to provide students with proper safety instructions or proper safety equipment for a trip to Playa Tortuga. Students were only instructed to swim parallel to shore if they were caught in a rip current.

10. Failing to take proper precautions to make Playa Tortuga safer when they took their students there, including requesting lifeguards to be on duty.

11. Failing to effectively assist Ravi after he was caught in the rip current and yelled out for help.

12. Failing to rescue Ravi from drowning at Playa Tortuga.

(Compl. ¶ 46.) In their wrongful death claim, the Thackurdeens incorporate the allegations from their negligence claim, and then state, "the negligent acts and omissions of Defendants directly and proximately caused the wrongful death of Ravi Thackurdeen." (Id. ¶ 51.) They then allege that "the actions and omissions

of Defendants in causing Ravi's death were negligent, grossly negligent, malicious, wanton, willful, and/or done with reckless disregard for the rights and privileges of others." (Id.)

The conduct alleged in the negligence claim and the wrongful death claim does not rise to the level of gross negligence under North Carolina law. Despite alleging that Duke's and OTS's "actions and omissions were . . . grossly negligent, malicious, wanton, and/or in reckless disregard for the rights and privileges of others," (compl. ¶¶ 47, 51), the Thackurdeens have failed to allege any specific act committed "purposely" with "conscious disregard for the safety of others." Ray v. N.C. Dep't of Transp., 727 S.E. 2d 675, 684 (N.C. 2012). They allege that the students were told it was safe to swim, warned of rip currents, and told what to do if one was encountered. (Compl. ¶ 32.) In addition, the Complaint recites a litany of "failures" on the part of Duke and OTS including – failure to warn the students of the dangers of swimming at Playa Tortuga and failure to supply lifeguards or safety equipment. (Id. ¶ 32) However, while these allegations may speak to the degree or magnitude of carelessness, there are not allegations that either Duke or OTS acted with the requisite mental state to support a claim for gross negligence. In a tragic turn of events, Ravi went swimming with a fellow student, was caught in a rip current, and drowned. (Id. ¶ 16.) The Thackurdeens do allege that Duke and OTS failed to assist Ravi when he was drowning and failed to rescue him. (Id. ¶ 46.) However, there are no other allegations in the Complaint to support this alleged failure on Duke and OTS's part. The Complaint

simply states that Ravi called out for help when he was pulled out to sea and eventually drowned. (Id. ¶¶ 16-17.) Though undeniably tragic, there is nothing alleged regarding what Duke or OTS did or did not do in response to Ravi's situation. Construing the Complaint in the light most favorable to the Thackurdeens, they fail to allege facts that would establish any intentional wrongdoing or deliberate misconduct on the part of Duke or OTS that led to Ravi's drowning and would support a claim for gross negligence. Accordingly, the claims stated by the Thackurdeens sound in negligence, which can be waived, and not in gross negligence, which potentially cannot under North Carolina law.

**2.**

The Thackurdeens next argue that their first and second claims fall outside the scope of the waivers and are, therefore, not barred by the doctrine of waiver and release. Specifically, they contend,

> [t]his surprise beach trip took place after the OTS study abroad program concluded and just one day prior to Ravi's scheduled trip home. The trip served no educational purpose and was not placed onto the program schedule. It was not contemplated by Plaintiffs (or Ravi) at the time the releases were executed. Defendants' releases simply do not cover this surprise trip.

(Pls.' Joint Resp. to Duke's Mot. at 14-15; see also Pls.' Joint Resp. to OTS's Mot. at 15-16.)

The Duke waiver includes a provision releasing Duke "from any liability whatsoever for any personal injury . . . arising from participation in the program." (Statement of Authorization and Consent [Doc. #66-3 at 2].) "Program" is not

defined in the Duke waiver, but under "Program Title/Site," it lists "Global Health Semester Spring 2012/Costa Rica." (Id. at 1.) The Duke waiver also includes the language that "[w]e understand that in addition to regular classes the program may include planned lectures and field trips which are germane to the educational experience, and that the student agrees to participate willingly in such activities in addition to attending regular classes." (Id. at 2.)

The Thackurdeens argue that, "[t]his surprise beach trip was not a regular class, planned lecture or field trip which was germane to the educational experience. Thus, this beach trip does not fall within the scope of the "program" and [the waiver] does not release legal claims arising therefrom." (Pls.' Joint Resp. to Duke's Mot. at 15.)

However, "[w]here a contract does not define a term used, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." WakeMed v. Surgical Care Affiliates, LLC, 778 S.E.2d 308, 312 (N.C. Ct. App. 2015)(internal quotations omitted). The Duke waiver does not include beginning or end dates for the Global Health Program, but it does include that it covers the Global Health Program. According to the Complaint, "this 15-week program was meant for students to study both the scientific and social aspects of tropical medicine, public health, and ethnobiology with full-time instruction by scientists and physicians in various fields." (Compl. ¶ 25.) The ordinary meaning of "program" in the context of the Duke waiver

encompasses the entirety of the Global Health Program. It contemplates the Global Health Program as an entire, semester-long program.

Assessing the allegations in the Complaint in conjunction with the language of the Duke waiver, the beach trip was within the activity contemplated by the waiver. The Complaint specifies that Duke and OTS took "their students" on this field trip. The waiver addresses "participation in this program" with the "program" being the Global Health Program. There is nothing to indicate that the trip to the beach was independent of the Global Health Program causing it to be outside the scope of the Duke waiver. See e.g., Palacino v. Beech Mountain Resort, Inc., 2016 WL 830827, at *1 (W.D.N.C. March 3, 2016) (holding injury outside scope of waiver when "[a]t the point in time when the injury allegedly occurred, Plaintiff was not skiing, snowboarding, or tubing. As a result, the waiver and the assumption of risk language stated in the lift ticket and equipment rental agreement would not apply to the Plaintiff at the time of the incident"); Strawbridge v. Sugar Mountain Resort, Inc., 320 F. Supp. 2d 425, 432 (W.D.N.C. 2004) (holding equipment rental waiver did not bar claim because the release only barred actions caused by the rented equipment and not injuries sustained from the conditions of the mountain).

The same is true for the OTS waiver. It includes the provision releasing OTS for liability that "occurs as a result of . . . traveling to and from, and participation in this activity." (OTS Participation Agreement – Costa Rica [Doc. #66-4 at 3].) The Thackurdeens argue that, like the Duke waiver, the OTS waiver is not applicable to

the beach trip where Ravi drowned. "[T]his surprise beach trip which took place after the OTS study abroad program concluded and just one day prior to Ravi's scheduled trip home, was not a regular class, planned lecture or field trip germane to the educational experience. Thus, this beach trip does not fall within the scope of "activity" within the definitional context provided by both Releases. (Pls.' Joint Resp. to OTS's Mot. 16.) However, in the Complaint, they allege, "Towards the end of the semester . . . , Duke and OTS took their students to a surprise, celebratory trip to the beach at Playa Tortuga . . . Duke had been taking its students to this beach as part of its OTS program for three consecutive years." (Compl. ¶¶ 14, 15.) Like the Duke waiver, the OTS waiver applies to the Global Health Program in its entirety. The waiver is not written in such a way that exempts certain group activities. In addition, the Thackurdeens describe the surprise beach trip as part of the Global Health semester in their Complaint. The surprise beach trip was a program sponsored event and was part of the Global Health Program. As such, it is not outside the scope of the waivers signed for either Duke or OTS.

**3.**

The Thackurdeens' final argument is that the Duke and OTS waivers are void because they violate a substantial public interest. Generally, parties may contract to "bind themselves as they see fit" unless the contract violates the law or is against public policy. Lexington Ins. Co. v. Tires Into Recycled Energy & Supplies, Inc., 522 S.E.2d 798, 800 (N.C. Ct. App. 1999) (quoting Hall v. Sinclair Refining

Co., 89 S.E.2d 396 (N.C. 1955)). "However, contracts which attempt to relieve a party from liability for damages incurred through personal negligence are discouraged and narrowly construed[.]" Id. (citation omitted). "The contract will never be so interpreted [to exempt liability for negligence] in the absence of clear and explicit words that such was the intent of the parties." Winkler v. Appalachian Amusement Co., 79 S.E.2d 185, 190 (N.C. 1953). Even if a contract clearly and explicitly waives liability for negligence, courts will not enforce it if it (1) is violative of a statute, (2) is gained through inequality of bargaining power, or (3) is contrary to a substantial public interest. Waggoner v. Nags Head Water Sports, Inc., 141 F.3d 1162 (4th Cir. 1998) (unpublished table decision); see also Strawbridge, 320 F.Supp.2d at 432.

The Thackurdeens contend that the substantial public interest exception to the general validity of exculpatory contracts applies in this case. (Pls.' Joint Resp. to OTS's Mot. at 19.) "While recognizing the right to contract against liability, our courts have stated 'that a party cannot protect himself by contract[ing] against liability for negligence in the performance of a duty of public service, or where a public duty is owed, or public interest is involved.'" Alston v. Monk, 373 S.E.2d 463, 466 (N.C. Ct. App. 1988), disc. review denied, 378 S.E.2d 420 (N.C. 1989) (quoting Hall v. Sinclair Refining Co., 242 89 S.E.2d 396, 398 (N.C. 1955)). An activity falls within the substantial public interest exception when the activity is extensively regulated to protect the public from danger, and it would violate public policy to allow those engaged in such an activity to "absolve themselves from the

duty to use reasonable care." Id. North Carolina courts have found the performance of abortions, hair services performed at a cosmetology school, and motorcycle safety courses are highly regulated activities and, thus, trigger the substantial public interest exception. Compare Tatham v. Hoke, 469 F. Supp. 914 (W.D.N.C. 1979) (applying North Carolina law and holding portion of waiver contrary to public policy in a doctor patient relationship when patient sued physician for negligent performance of an abortion because medicine and abortions are both highly regulated to protect patient safety), Alston, 373 S.E. 2d at 466–67 (applying North Carolina law and finding waiver contrary to substantial public interest because the practice of cosmetology and instruction leading to licenses in cosmetology are highly regulated), and Fortson v. McClellan, 508 S.E.2d 549, 552 (N.C. Ct. App. 1998) (holding waiver violated public policy where student was injured by motorcycle assigned to him by the instructor in a motorcycle safety class because "[i]mportant public safety interests are present both in the instruction and use of motorcycles because both those receiving instruction in the proper use of motorcycles and the general traveling population are at risk from negligent training in the use of motorcycles." ) with Hyatt v. Mini Storage on Green, 763 S.E.2d 166, 170 (N.C. Ct. App. 2014) (waiver did not violate public policy where plaintiff sustained personal injuries when closing the door of his storage unit where the self-storage industry is not highly regulated).

In support of their argument, the Thackurdeens assert that the exception applies because higher education is a highly regulated activity in North Carolina.

(Pls.' Joint Resp. to Duke's Mot. at 19 ("Post-secondary education is, in fact, extensively regulated."). However, when courts have found the public interest exception applies, they analyze the regulation of the activity that caused the injury. For example, in McMurray v. U.S., the Fourth Circuit Court of Appeals addressed this issue in the context of a high school guidance counselor who signed a waiver and release in order to participate in a Marine Corps workshop. McMurray v. U.S., 551 F. App'x. 651 (4th Cir. 2014)(unpublished). The guidance counselor was badly injured while being driven by a Marine Corps recruiter tasked with driving her to and from the workshop, when he ran a red light and collided with another vehicle. With regard to the substantial public interest exception, the plaintiff

> contend[ed] that operating motor vehicles on public roads is a dangerous and heavily regulated activity. Given the significant public interests at stake, [plaintiff] argue[ed] that it would violate public policy to permit drivers to absolve themselves of the duty to exercise reasonable care when driving.

McMurray, 551 Fed. Appx. at 653. Ultimately, the court concluded that "under the circumstances of this case, it would violate public policy to permit the government to absolve [itself] from the duty to use reasonable care when driving. Id. at 656. The focus in McMurray was not whether or not taking part in the educational activity was a highly regulated activity, but whether or not driving was a highly regulated activity.

Accordingly, the activity in question here is the activity that caused the injury, swimming in the ocean, and not higher education as argued by the Thackurdeens. As such, the Court finds that swimming in the ocean is not an

-26-

extensively regulated activity like driving or medicine that triggers the substantial public interest exception. Here, Ravi and his father signed two waivers. The language of the waivers is clear and includes a release from any liability arising out of the injury or death of a participant while on the Global Health Program. The beach trip where this tragic event took place was an activity sponsored by the Global Health Program and Ravi's death occurred while he was swimming in the ocean during the beach outing. There is nothing to support a finding that swimming in the ocean is the type of highly regulated activity that triggers the substantial public interest exception to the enforceability of the waivers Ravi and his father signed. See generally Darden v. Pebble Beach Realty, Inc., 860 F. Supp. 1101, 1104 (E.D.N.C. 1993) ("The court finds as a matter of North Carolina law that the defendants had no duty to maintain a safe swimming area in the Atlantic Ocean, provide lifeguards or safety equipment on the public beaches of North Carolina, or warn the decedent of the inherent dangers of ocean swimming.").

## IV.

For the reasons stated herein, **IT IS HEREBY ORDERED** that Defendant Duke University's Motion for Judgment on the Pleadings [Doc. #67] is **DENIED IN PART** in that this Court finds the parties were served within the time allotted and personal jurisdiction is established over each Defendant by the extension of time to serve and **GRANTED IN PART** in that Plaintiffs' claims for (1) Negligence and (2) Wrongful Death are barred by Waiver and Release. **IT IS FURTHER ORDERED** that Defendant Organization for Tropical Studies' Motion to Dismiss, or in the

alternative, For a Judgment on the Pleadings [Doc. #71] is **DENIED IN PART** in that this Court finds the parties were served within the time allotted and personal jurisdiction is established over each Defendant by the extension of time to serve and **GRANTED IN PART** in that Plaintiffs' claims for (1) Negligence and (2) Wrongful Death are barred by Waiver and Release. The Intentional Infliction of Emotional Distress claim against both Defendants remains.

This the 23 day of March, 2018.

Senior United States District Judge